THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JAMES KOZLOWSKI,                          :
                                          :
                Plaintiff,                :
                                          :        CIVIL ACTION NO. 3:18-CV-353
        v.                                :        (JUDGE MARIANI)
                                          :
JFBB SKI AREAS, INC., d/b/a               :
JACK FROST and BIG BOULDER                :
SKI RESORTS,                              :
                Defendant.                :

## MEMORANDUM OPINION
### I. INTRODUCTION

The Motion for Summary Judgment on Behalf of Defendant JFBB Ski Areas, Inc.,

(Doc. 30) is pending before the Court. The above captioned matter stems from a skiing

accident that occurred on January 15, 2017, at Big Boulder Ski Resort ("Big Boulder").

(Doc. 30 ¶ 1.) Plaintiff's Amended Complaint (Doc. 24), the operative Complaint in this

action, contains two counts: Count I for Negligence (*id.* at 5) and Count II for Gross

Negligence/Recklessness (*id.* at 9). Plaintiff states that he was skiing at Big Boulder and,

as he came to an intersection of trails, he followed tracks which led to an embankment at

the edge of a catwalk. (Doc. 24 ¶¶ 14-17.) Plaintiff asserts that, as he skied down the

embankment, he suddenly and unexpectedly collided with partially exposed snowmaking

pipes which could not be seen from a reasonably safe distance in the area where he was

skiing. (*Id.* ¶¶ 18-20.) He alleges that he was rendered unconscious as a result of the

collision and had to be dug out from under the pipes before he was transported to the

hospital by ambulance. (*Id.* ¶ 21.)

With the pending motion, Defendant seeks judgment in its favor on all claims. (Doc. 30 at 3.) Defendant specifically asserts that Plaintiff's claims are barred by the Pennsylvania Skier's Responsibility Act, 42 Pa. C.S.A. § 7102(c) ("the Act"), the common law construing the Act, and the Release found on Big Boulder's ski lift ticket. (Id. ¶¶ 6, 7.) For the reasons that follow, this Court will deny Defendant's motion.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

On January 15, 2017, Plaintiff traveled with his family and others to the Big Boulder Ski Area to ski for the day. (Doc. 32 ¶¶ 1-2; Doc. 37 ¶¶ 1-2.) The weather was clear and the temperature was approximately 28 degrees Fahrenheit. (Doc. 32 ¶ 4; Doc. 37 ¶ 4.) Plaintiff had never before visited or skied at Big Boulder. (Doc. 37 ¶ 36; Doc. 41 ¶ 36.) He did not execute or sign a release form prior to skiing at Big Boulder on January 15, 2017. (Doc. 37 ¶ 65; Doc. 41 ¶ 65.) A member of Plaintiff's family purchased his lift ticket for him to ski that day. (Doc. 37 ¶ 66; Doc. 41 ¶ 66.) Plaintiff did not read the back of his lift ticket before his incident on January 15, 2019. (Doc. 37 ¶ 67; Doc. 41 ¶ 67.)

Plaintiff was an experienced skier who had skied for over forty years. (Doc. 32 ¶ 3; Doc. 37 ¶ 3.) On the run involving the accident, Plaintiff was skiing down the Draufganger

---

[1] In addition to his response to Defendant's statement of facts (Doc. 37 ¶¶ 1-35), Plaintiff provides "Additional Facts Precluding Summary Judgment" (id. ¶¶ 36-67). Defendant has responded to these averments (Doc. 41). Therefore, the Court will include Plaintiff's factual averments which are undisputed. The parties provide citations to the record in support of the factual averments. (See Docs. 32, 37.) The Court has verified the citations but, with limited exceptions, does not include them in the recitation set out in the text.

trail, slightly to the left side, until the trail intersected with the Bunny Schuss trail. (Doc. 32 ¶ 5; Doc. 37 ¶ 5.) Prior to the accident, Plaintiff had no problem skiing the Draufganger trail. (Doc. 32 ¶ 6; Doc. 37 ¶ 6.) At the intersection of the Draufganger and Bunny Schuss trails, Plaintiff made a decision to head toward the ski lift to the right and "'headed towards the slope.'" (Doc. 32 ¶ 7 (quoting Kozlowski Dep. 72:25-73:1 (Doc. 32-1 at 20)); Doc. 37 ¶ 7.) Plaintiff saw ski tracks in the snow and headed towards the chairlift. (Doc. 32 ¶ 8; Doc. 37 ¶ 8.)[2] The tracks led to an embankment at the edge of the catwalk. (Doc. 32 ¶ 9; Doc. 37 ¶ 9.)[3] Plaintiff skied to that area intentionally and, in doing so, ultimately skied off the trail and into a ravine where the snowmaking pipes were located. (Doc. 37 ¶ 41; Doc. 41 ¶ 41.) Plaintiff and his family members testified that the snowmaking pipes appeared to be on the trail identified as lower Bunny Schuss/Draufganger. (Doc. 37 ¶ 46; Doc. 41 ¶ 46.)

Big Boulder's ski patrol uses bamboo, rope, fencing, and signs to alert skiers to potential hazards. (Doc. 37 ¶ 52; Doc. 41 ¶ 52.) There is no shortage of bamboo, rope, fencing, and blue buckets at Big Boulder. (Doc. 37 ¶ 54; Doc. 41 ¶ 54.) At the time of

---

[2] Although Plaintiff denies Defendant's statement that "Plaintiff Kozlowski observed ski tracks in the snow leading towards the chairlift" (Doc. 32 ¶ 8 (citing Doc. 24 ¶ 16)), he does so on the basis that Defendant's statement is an inaccurate recitation of his statement in the Amended Complaint that "'Mr. Kozlowski saw sets of ski tracks in the snow and headed towards the chairlift'" (Doc. 37 ¶ 8 (quoting Doc. 24 ¶ 16)). Because the parties agree on the substance of paragraph 16 of the Amended Complaint, the Court considers the averment contained therein to be an undisputed statement of fact.

[3] As with paragraph 8 discussed in note 2, Defendant cites Plaintiff's Amended Complaint in support of the stated fact but uses different words—here substituting the word "trail" for "catwalk"—and this distinction is the basis for Plaintiff's denial of the statement. (See Doc. 32 ¶ 9; Doc. 37 ¶ 9; Doc. 24 ¶ 17.) Because the parties agree on the substance of paragraph 17 of the Amended Complaint, the Court considers the averment contained therein to be an undisputed statement of fact.

Plaintiff's accident, no orange markers were placed uphill of the snowmaking pipes to warn patrons of their location. (Doc. 37 ¶ 57; Doc. 41 ¶ 57.) Big Boulder's ski patrol can also mitigate hazards on the slope by contacting the slope groomers or mountain operation personnel. (Doc. 37 ¶ 58; Doc. 41 ¶ 58.) Big Boulder admitted the pipes were marked after Plaintiff's accident. (Doc. 37 ¶ 60; Doc. 41 ¶ 60.)

Plaintiff was familiar with the Skier's Responsibility Code and understood he was responsible for skiing in control. (Doc. 32 ¶ 12; Doc. 37 ¶ 12.) Plaintiff understood it was his responsibility to stay on the trail. (Doc. 32 ¶ 13; Doc. 37 ¶ 13.) Plaintiff understood he could fall and suffer injury while skiing. (Doc. 32 ¶ 14; Doc. 37 ¶ 14.) Plaintiff knew he should be alert for natural and man-made objects. (Doc. 32 ¶ 15; Doc. 37 ¶ 15.)

Ski Patroller Michael Dodge prepared a Winter Incident Report, took photographs, and prepared a diagram of the scene. (Doc. 32 ¶ 16; Doc. 37 ¶ 16.) Plaintiff's family also took photographs of the scene on the day of the accident. (Doc. 32 ¶ 25; Doc. 37 ¶ 25.)

## III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127

S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary

judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts. Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial. The mere existence of some alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for summary
> judgment; the requirement is that there be no *genuine* issue of *material* fact.
> When opposing parties tell two different stories, one of which is blatantly
> contradicted by the record, so that no reasonable jury could believe it, a court
> should not adopt that version of the facts for purposes of ruling on a motion for
> summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make

credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S.

at 255. Therefore, when evidentiary facts are in dispute, when the credibility of

witnesses may be in issue, or when conflicting evidence must be weighed, a full trial

is usually necessary.

## IV. ANALYSIS

With the pending summary judgment motion, Defendant argues the following:

Plaintiff assumed, as a matter of law, the inherent risk of skiing off trail into snowmaking

equipment; Plaintiff's claims are barred by the exculpatory release on the Big Boulder lift

ticket; and Plaintiff's claims for gross negligence and recklessness are barred because the

record does not support the elements of a claim for ordinary negligence. (Doc. 31 at 9-10.)

The Court will address each argument in turn.

## A.    Inherent Risks of Skiing

Defendant contends that Plaintiff's negligence claim is barred by the assumption of

the risk doctrine as preserved by the Skier's Responsibility Act, 42 Pa. C.S. § 7102(c).

(Doc. 31 at 10-11.)  Plaintiff principally asserts that he did not know or fully appreciate the

specific risk of colliding with the hidden snowmaking pipes and the risks created by Big

Boulder are not inherent to skiing.  (Doc. 38 at 9-22.)   The Court concludes that although

Plaintiff's subjective appreciation of the risk involved is not germane to the relevant inquiry,

Defendant has not established as a matter of law that the risk at issue in this case is

inherent in the sport of downhill skiing.

As in a case decided this year by a panel of the Third Circuit Court of Appeals, *Vu v.

Ski Liberty Operating Corp.*, 763 F. App'x 178 (2019) (not precedential), the Pennsylvania

statute which codifies the Pennsylvania Skier's Responsibility Act ("PSRA"), 42 Pa. C.S. §

7102(c), is central to the Court's consideration of Plaintiff's negligence claim.  The provision

states as follows:

**(c) Downhill skiing.--**

(1) The General Assembly finds that the sport of downhill skiing is practiced by a large number of citizens of this Commonwealth and also attracts to this Commonwealth large numbers of nonresidents significantly contributing to the economy of this Commonwealth. It is recognized that as in some other sports, there are inherent risks in the sport of downhill skiing.

(2) The doctrine of voluntary assumption of risk as it applies to downhill skiing injuries and damages is not modified by [the Comparative Negligence Act].

7

42 Pa. C.S. § 7102(c).

> *Vu* explains that the PSRA

> acknowledges that "there are inherent risks in the sport of downhill skiing," 42 Pa. Cons. Stat. § 7102(c)(1), and, for that reason, [it] "preserves assumption of risk as a defense to negligence suits stemming from downhill skiing injuries," *Smith v. Seven Springs Farm, Inc.*, 716 F.2d 1002, 1007 (3d Cir. 1983).

> The PSRA establishes a "no-duty" rule for skiing injuries, relieving ski resorts of the "duty to protect skiers from risks that are 'common, frequent, and expected,' and thus 'inherent' to the sport." *Chepkevich v. Hidden Valley Resort, L.P.*, 607 Pa. 1, 2 A.3d 1174, 1186 (2010). The no-duty rule applies in this context when: (1) the plaintiff was "engaged in the sport of downhill skiing at the time of her injury"; and (2) the risk of the injury at issue "is one of the 'inherent risks' of downhill skiing." *Hughes v. Seven Springs Farm, Inc.*, 563 Pa. 501, 762 A.2d 339, 344 (2000). When both prongs are met, summary judgment is warranted in favor of the ski resort "because, as a matter of law, [the plaintiff] cannot recover for her injuries." *Id.*

> The PSRA "is unusual in its brevity and failure to give any definition of an 'inherent' risk of skiing," *Chepkevich*, 2 A.3d at 1188 n.15, so we turn to caselaw for guidance. The Pennsylvania Supreme Court has identified collisions with other skiers, "snow and ice, elevation, contour, speed and weather conditions," *Hughes*, 762 A.2d at 344, and falling from a ski lift, *Chepkevich*, 2 A.3d at 1188, as inherent risks. It has also instructed other courts to adopt "a practical and logical interpretation of what risks are inherent to the sport," *id.* at 1187–88, and explained that invocation of the PSRA does not require proof that the injured skier assumed the "specific risk" that caused injury — only that the injury arose from a "general risk" inherent to the sport, *id.* at 1188.

*Vu.*, 763 F. App'x at 180–81.

Applying this guidance, the first prong of the *Hughes* test is not at issue: Plaintiff was engaged in the sport of downhill skiing when the accident happened. Thus, the Court moves on to the "inherent risk" prong of the inquiry.

As set out above, "inherent risks" are those "risks that are 'common, frequent, and expected'" in the sport of downhill skiing. *Chepkevich*, 2 A.3d at 1186 (quoting *Hughes*, 762 A.2d at 343-44). "[T]he clear legislative intent to preserve the assumption of the risk doctrine in this particular area, as well as the broad wording of the Act itself, dictates a practical and logical interpretation of what risks are inherent to the sport." *Id.* at 1187-88.

Defendant first argues that snowmaking pipes are an inherent risk of skiing, relying on authority which holds that collisions with snowmaking equipment, whether on or off the trail, are an inherent risk of the sport. (Doc. 31 at 17 (citing *Smith-Wille v. Ski Shawnee, Inc.*, No. 375 Civil 2006, 2014 WL 8865119 (Monroe Co., Jan. 6, 2014)).) In *Smith-Wille*, the court considered whether the plaintiff was injured as the result of the inherent risks of downhill skiing where the plaintiff had skied into fencing on the edge of a trail after losing control when she hit a patch of ice on the trail. 2014 WL 8865119, at *1. Following the finding that there is no duty to warn of icy conditions "[s]ince ice is an inherent risk of skiing," *id.* at *5, *Smith-Wille* analyzed the risks attendant to the fencing and poles:

> There also is no duty to warn of the fencing and poles holding the fencing. The fence was located at the edge of the ski trail to prevent skiers from skiing off the trail into woods and/or the chairlift poles. The fencing was made of mesh and was secured to the ground by poles. The fencing also marked the edge of the trail and was notice itself for skiers to stay away from it. The edge of the ski slope, and a support pole for a lift are inherent risks of skiing. Striking a

9

protective fence designating and protecting skiers from the edge of the trail and the chairlift pole is an inherent risk of skiing as well. Therefore, no warning needs to be given.

*Smith-Wille*, 2014 WL 8865119, at *5.

In addition to *Smith-Wille*, Defendant cites several cases where courts found inherent risks related to snowmaking equipment and fixed objects to support the proposition that a skier accepts the risk of colliding with rigid, man-made obstacles at or near the trail's edge or even on the trail. (Doc. 31 at 19-23.) In *Ruckner v. Spring Mountain Adventures, Inc.*, Court of Common Pleas of Montgomery County, No. 2006-19380, the plaintiff was skiing at Spring Mountain when she lost control and skied into a snowmaking gun at the edge of the trail. (Doc. 31 at 19.) In *Dong Lin v. Spring Mountain Adventures, Inc.*, Civ. A. No. 10-333, 2010 WL 5257648 (E.D. Pa. Dec. 23, 2010), the plaintiff was skiing at Spring Mountain when she lost control and collided with snowmaking equipment located on the slope. (Doc. 31 at 20.) In *Glasser v. Seven Springs Mt. Resort*, No. 237 of 2006, 2008 WL 5575059 (Ct. of Common Pleas of Fayette County, Nov. 7, 2008), the plaintiff lost control and collided with a snowmaking pole. (Doc. 31 at 22.) From *Glasser, Dong-Lin, Ruckner,* and *Smith-Wille*, Defendant concludes that "it cannot be argued that a ski operator has a duty to protect, warn against or preclude collisions with conditions or hazards off the ski trail, i.e., trees, ruts, rocks or boulders and snowmaking equipment." (Doc. 31 at 23.)

Defendant then turns specifically to the inherent risk of skiing off the trail, first noting variables of terrain, trail conditions, topography, site distance, and a skier's obligation to be

prepared for ever-changing conditions on the slopes, and states that "staying on the trail undoubtedly falls within the category of the skier's responsibility." (Doc. 31 at 23-24.) Defendant notes that because "the perils one might face skiing off the trail are obvious, there is little precedent to state that skiing off the trail is an inherent risk of the sport." (*Id.* at 24.) However, Defendant cites several cases to support its proposition, including the Third Circuit's opinion in *Bjorgung v. Whitetail Resort, LP*, 550 F. 3d 263 (3d Cir. 2008), where the ski racer went off course during a race and was injured when he skied into the woods and hit a tree. The Circuit Court stated that "[t]he cognizable risks inherent in ski racing are legion" and

> include a failure by staff of a ski resort to (1) set netting in all spots where it might prove necessary, and (2) fix a race course in a way that minimizes the potential for the competitors to lose control. To decide otherwise would nullify 42 Pa.C.S.A. § 7102(c) in the context of competitive skiing and replace it with a negligence standard.

550 F.3d at 269.

Defendant also cites *Burke v. Ski America, Inc.*, 940 F.2d 95 (4th Cir. 1991), and *Vu v. Ski Liberty Operating Corp.*, 295 F. Supp. 3d 503 (2018), *aff'd sub nom. Vu v. Ski Liberty Operating Corp.*, 763 F. App'x 178 (3d Cir. 2019), in support of its assertion that skiing off a trail is an inherent risk of skiing. (Doc. 31 at 25-27.) In *Burke,* a Fourth Circuit removal case tried under Pennsylvania law, an expert skier was skiing on a double black diamond slope and was injured when she collided with trees and rocks after she fell and slid under a fence that was on the edge of the trail. 940 F.2d at 97. The plaintiff said she anticipated the

presence of ice on the trail and had seen the trees and rocks off the slope when she was ascending the ski lift. *Id.* The Fourth Circuit affirmed the trial court's directed verdict for the ski area, finding that the dangers and conditions on and off the slope where the plaintiff fell were obvious to a reasonable person, the possibility of a collision with trees and rocks off the trail presented an inherent risk of the sport of downhill skiing, and as well skiing under the trail-edge fence was also an inherent risk of the sport *Id.* at 97-98.

In *Vu*, the plaintiff Quan Vu veered to avoid a collision with a snowboarder and skied over the drop-off at the edge of the trail (created by snowmaking) and into a pile of rocks. 295 F. Supp. 3d at 509. The District Court noted that the "Supreme Court of Pennsylvania has specifically determined that the risk of collision with another person on the slope is inherent to the sport of downhill skiing." *Id.* (citing *Hughes*, 762 A.2d at 344). In considering whether "skiing over the edge of the trail and encountering a three to four-foot drop-off into a pile of rocks is an inherent risk of downhill skiing," *id.*, the court distinguished "the drop-off at the edge of the trail [from] a ditch or hole in the slope itself," *id.* at 510, and held that "the risk of skiing off trail and suffering from the change of elevation between the trail and surrounding terrain is an inherent risk of downhill skiing," *id.* The court noted that testimony showed there was no difficulty discerning the edge of the slope on the trail where the accident occurred and no evidence suggested otherwise. *Id.* Based on these circumstances, the court explained that

> [i]t would be irrational for any court to hold that skiing off trail and encountering dangerous terrain is not an inherent risk of the sport of downhill skiing—ski

slopes are marked and maintained in appreciation of this risk, and beginner and experienced skiers alike know to stay within the trail limits to avoid injury. Mr. Vu himself testified that he understood that he could run into trees, rocks, boulders, or snowmaking equipment if he skied off trail.

295 F. Supp. 3d at 510. In affirming the trial court decision, a panel of the Third Circuit Court of Appeals noted testimony from the plaintiff's daughter that the edge of the trail could be discerned with no difficulty and testimony from a witness that "he was able to 'easily' distinguish the skiable terrain from off trail." 763 F. App'x at 180. The inherent risk analysis conducted by the Third Circuit panel concurred with the trial court that "skiing over a slope edge and leaving the trail is an inherent risk of downhill skiing from which the defendants had no duty to protect Vu." *Id.* at 181 (citing *Chepkevich*, 2 A.3d at 1187). The panel further explained that Vu, an experienced skier, acknowledged the risk that he could encounter rocks and trees if he skied off trail and Vu's daughter and the witness "both testified they had no trouble discerning the slope edge, and on trail from off trail" on the date of the accident. 763 F. App'x at 181-82.

The elements of lack of control and some degree of visibility of the obstacle or hazard run through the snowmaking equipment and fixed obstacle cases cited by Defendant. *See supra* pp. 9-12. Risks of skiing off trail in Defendant's cited cases also have an element of cognizability as specifically stated in *Bjorgung*, 550 F.3d at 269, recognized in *Burke*, 940 F.2d at 97-98, and acknowledged in *Vu*, 763 F. App'x at 181-82. In each case cited, the skier was out of control or, in the case of the ski racer in *Bjorgung*, skiing at a high rate of speed where skiing on the edge of control is the norm, and struck an

obstacle or encountered a condition which was deemed an inherent risk. Where the edge of a trail was at issue, the skier knew where the edge of the trail was located or testimony showed that the edge of the trail was easily discernable.

Although the edge of a ski slope, support poles for lifts, and protective fencing designating and protecting skiers from the edge of a trail and other hazards are inherent risks of skiing, these risks involve elements that are arguably not present in this case: the inherent risks of the edge of the trail, snowmaking equipment, fencing, and poles were expected and visible to the skier where here Plaintiff maintains that the snowmaking pipes were not readily visible and the edge of the trail could not be ascertained from a safe distance (Doc. 36 at 15). Further, the inherent risk of losing control is arguably not present here as Plaintiff asserts that he was skiing in control and traveling at a safe rate of speed at the time of his collision with the snowmaking pipes. (Doc. 36 at 7.) The Court finds it particularly noteworthy that the trial court in *Vu* stated that "ski slopes are marked and maintained" in appreciation of the inherent risk of skiing off trail and encountering dangerous terrain and "beginning and experienced skiers alike know to stay within the trail limits to avoid injury." 295 F. Supp. 3d at 510. Importantly, a skier who "know[s] to stay within the trail limits" logically can only do so if the trail limits are discernable. Thus, an aspect of the inherent risk finding in *Vu* was the ability of a skier to detect the edge of the trail.

As noted above, a central issue in this case is whether the edge of the trail was discernable. No case cited by Defendant supports the proposition that a difficult to detect,

14

unmarked hazard found on terrain which is reasonably considered part of a trail or slope is "common, frequent, and expected," *Chepkevich*, 2 A.3d at 1186, in the sport of downhill skiing. Seen in the context of the "practical and logical interpretation of what risks are inherent to the sport," *Chepkevich*, at 1187-88, it is practical and logical that a skier is to ski on the trail and skiing off the trail is an inherent risk of the sport of downhill skiing; it is practical and logical that that the existence of snowmaking pipes located off trail are an inherent risk of the sport. However, it is not necessarily practical and logical to conclude that encountering a hazard while skiing in an area that lacks indicia of being off-trail presents a similar inherent risk. In other words, while the edge of a ski slope may be an inherent risk of the sport of downhill skiing, an undetectable hazard in an area that can reasonably be considered part of a ski slope is not necessarily so classified. This determination is supported by the fact that the *Vu* trial court noted a distinction between hazards that are located off-trail and similar on-trail conditions, differentiating "the drop-off at the edge of the trail" from "a ditch or hole in the slope itself," 295 F. Supp. 3d at 510.

The foregoing analysis is bolstered by the decision reached by a panel of the Pennsylvania Superior Court in *Balkovec v. Hidden Valley Four Seasons Resort*, No. 1816 EDA 2015, 2017 WL 117691 (Pa. Super. Ct., Jan 12, 2017) (not precedential). *Balkovec* considered whether skiing off trail was categorically an inherent risk of downhill skiing where the plaintiff mistakenly believed she was skiing on the trail and was injured as a result of off-trail terrain and conditions. 2017 WL 117691, at *1. The trial court had sustained the

15

defendant's preliminary objections and dismissed the plaintiff's negligence suit, concurring with the defendant that the suit was barred by the Skier's Responsibility Act. Under the facts pled, the court found that the defendant was under no duty to the plaintiff "because the risk of being injured from blindly pursuing a downhill course into unknown terrain was a risk inherent to the sport of downhill skiing." 2017 WL 117691, at *2. The Superior Court panel disagreed, finding that the plaintiff had taken a course which appeared to her to be an appropriate route, a determination "arrived at in the absence of any signage, fencing, barricades or warnings" by the defendant alerting skiers to proceed otherwise. *Id.* at *5. Because it was "unclear whether a risk inherent in the sport of downhill skiing caused her accident and the resulting injuries," the court reversed and remanded. *Id.*

Plaintiff cites *Balkovec* in support of his assertion that "Big Boulder was negligent in failing to erect signage, fencing, barricades, and warnings to identify hidden pipes" in the absence of a visible line of demarcation identifying the trail's edge. (Doc. 36 at 15.) Defendant rejects Plaintiff's reliance on *Balkovec*, stating that

> *Balkovec* may be appealing on its face, but it provided not [sic] precedential value. First, it is an unpublished opinion of the Pennsylvania Superior Court, at which time the internal operating procedures of the Court made it clear that it was not to be cited. Second, and more importantly, the decision on appeal was based on preliminary objections. The panel of the appellate court made it clear that although on its face the Complaint raised sufficient issues of fact to preclude dismissal, *id.* at 4, "[w]e express no opinion as to the merits of Balcovec's action. Our decision today holds only that it cannot be determined with any certainty on preliminary objections that Balcovec's cause of action is barred by the assumption of the risk doctrine as applied to downhill skiing." *Id.*, n.3.

(Doc. 40 at 17-18.)

As to the propriety of this Court citing *Balcovec*, the Court is free to consider the decision as a non-precedential Superior Court panel opinion decided in a different context than that presented here. In so doing, the Court finds the *Balcovec*, though not precedential, indicates that, under Pennsylvania law, a finding that hazards existing on the other side of an undelineated edge of a trail are not *always* to be considered an inherent risk of the sport of downhill skiing. The *Balkovec* holding and this Court's reading of the case are consistent with a conclusion that cognizability matters, i.e., the skier being able to expect and/or identify the hazard while skiing is an element of the collision and trail-edge cases reviewed. Thus, in a case where the discernibility of the trail edge is in dispute, the Court cannot find as a matter of law that the accident was the result of an inherent risk of the sport of downhill skiing.

Defendant discounts *Balkovec* on procedural rather than substantive grounds (Doc. 40 at 17-18) and does not discuss the discernibility factor present in the cases where courts have found injuries related to skiing off trail to be a result of an inherent risk of the sport of downhill skiing.[4] Defendant makes no argument that a dangerous condition which exists on

---

[4] For example, this Court found that skiing into a fence located off the trail was an inherent risk of the sport of downhill skiing in *Cole v. Camelback Mountain Ski Resort*, Civil Action No. 3:16-CV-1959, 2017 WL 4621786, at *4 (M.D. Pa. Oct. 16, 2017). Thus, the Court held that the defendant "had no duty to protect [the plaintiff] from skiing off the trail and into the fence post, and that, consequently, Plaintiffs' negligence claim fails as a matter of law." *Id.* Importantly, though the Court recognized that skiing off the trail and into a fence was an inherent risk of the sport, trail-edge discernability was not a factor in the Court's determination.

the other side of an undetectable trail edge presents a risk that is "common, frequent, and expected'" in the sport of downhill skiing. Defendant has not shown that no issues of fact exist as to detectability of the trail edge in this case as well as other relevant matters.

In sum, based on the current record, the Court finds that issues of fact and credibility exist which preclude summary judgment on the issue of whether Plaintiff's injury resulted from a risk inherent to the sport of downhill skiing which Plaintiff must be conclusively found to have assumed. The issues of fact and credibility include the following: whether Plaintiff was skiing in control and at a safe rate of speed while skiing down Draufganger (Doc. 37 ¶¶ 38-39; Doc. 41 ¶¶ 38-39); whether Plaintiff intended to ski off trail and, if he did not, whether it was reasonable for Plaintiff to believe he was skiing on a trail when he skied to the edge of and into the ravine where the snowmaking pipes were located (Doc. 37 ¶¶ 40-41; Doc. 41 ¶¶ 40-41); and whether and/or how ski slopes in general, and those at Big Boulder in particular, "are marked and maintained to allow skiers to discern the trail edge," *Vu*, 295 F. Supp. 3d at 510.[5]

## B.  Gross Negligence/Reckless Conduct

Defendant asserts that the "record evidence in this case is devoid of any evidence to suggest gross negligence or reckless conduct and Plaintiff's claims should be dismissed as a matter of law." (Doc. 31 at 37.) Plaintiff maintains that Big Boulder's "decision to design,

---

[5] As noted in *Hughes*, "[o]nly when the plaintiff introduces adequate evidence that the amusement facility in which he was injured deviated in some relevant respect from established custom will it be proper for an 'inherent-risk' case to go to the jury." 762 A.2d at 343.

construct, and maintain steel snowmaking pipes in a hidden ravine . . . was either grossly negligent or reckless." (Doc. 36 at 25.) The Court concludes that a determination on this issue cannot be made at this stage of the proceedings.

The Pennsylvania Superior Court discussed gross negligence and recklessness in *Kibler v. Blue Knob Recreation, Inc.*, 184 A.3d 974 (Pa. Super. Ct. 2018). After finding that ruts made by an ATV on a slope were an inherent risk of downhill skiing and the trial court properly granted defendant's motion for summary judgment where the plaintiff was injured when he fell upon skiing into the ruts, *id.* at 977, 981, the Superior Court addressed the relationship between the validity of the release signed by the plaintiff and gross negligence or recklessness, *id.* at 981-86. Noting that the Supreme Court of Pennsylvania "has held that exculpatory releases of reckless behavior are contrary to public policy, 'as such releases would jeopardize the health, safety, and welfare of the people by removing any incentive for parties to adhere to minimal standards of safe conduct,'" 184 A.3d at 984 (quoting *Tayar v. Camelback Ski Corp., Inc.*, 47 A.3d 1190, 1203 (Pa. 2012), (citing *Hall v. Amica Mut. Ins. Co.*, 648 A.2d 755, 760 (Pa. 1994)), *Kibler* summarized the concepts of gross negligence and reckless conduct.

This court has observed the following pertaining to gross negligence:

> In *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695 (Pa. Super. 2000), *appeal denied*, 567 Pa. 715, 785 A.2d 90 (2001), we indicated that when courts have considered the concept of "gross negligence" in various civil contexts, they have concluded uniformly that there is a substantive difference between "ordinary negligence" and "gross negligence." *Id.* at 703. "The general

> consensus finds [that] gross negligence constitutes conduct
> more egregious than ordinary negligence but does not rise to the
> level of intentional indifference to the consequences of one's
> acts." *Id.* at 704 (relying in part on bailment cases and in part on
> the definition of "gross negligence" as applied to the [Mental
> Health Procedures Act] ). Gross negligence may be deemed to
> be a lack of slight diligence or care compromising a conscious,
> voluntary act or omission in "reckless disregard" of a legal duty
> and the consequences to another party. *Id.* at 704–705 (citing
> Black's Law Dictionary 1057 (7th ed. 1999)).

*In re Scheidmantel*, 868 A.2d 464, 485–486 (Pa. Super. 2005).

> While it is generally true that the issue of whether a given set of
> facts satisfies the definition of gross negligence is a question of
> fact to be determined by a jury, a court may take the issue from
> a jury, and decide the issue as a matter of law, if the conduct in
> question falls short of gross negligence, the case is entirely free
> from doubt, and no reasonable jury could find gross negligence.

*Downey v. Crozer–Chester Medical Center*, 817 A.2d 517, 525–526 (Pa.
Super. 2003) (*en banc*), quoting *Albright v. Abington Memorial Hospital*, 548
Pa. 268, 696 A.2d 1159, 1164–1165 (1997).

The *Tayar* court provided the following comparison of recklessness with
ordinary negligence:

> Recklessness is distinguishable from negligence on the basis
> that recklessness requires conscious action or inaction which
> creates a substantial risk of harm to others, whereas negligence
> suggests unconscious inadvertence. In *Fitsko v.
> Gaughenbaugh*, 363 Pa. 132, 69 A.2d 76 (1949), [our supreme
> court] cited with approval the Restatement ( [First] ) of Torts
> definition of "reckless disregard" and its explanation of the
> distinction between ordinary negligence and recklessness.
> Specifically, the Restatement (Second) of Torts defines "reckless
> disregard" as follows:
>
>> The actor's conduct is in reckless disregard of the safety
>> of another if he does an act or intentionally fails to do an

20

act which it is his duty to the other to do, knowing or
having reason to know of facts which would lead a
reasonable man to realize, not only that his conduct
creates an unreasonable risk of physical harm to
another, but also that such risk is substantially greater
than that which is necessary to make his conduct
negligent.

Restatement (Second) of Torts § 500 (1965). The Commentary
to this Section emphasizes that "[recklessness] must not only be
unreasonable, but it must involve a risk of harm to others
substantially in excess of that necessary to make the conduct
negligent." *Id.*, cmt. a. Further, as relied on in *Fitsko*, the
Commentary contrasts negligence and recklessness:

Reckless misconduct differs from negligence in several
important particulars. If [sic] differs from that form of
negligence which consists in mere inadvertence,
incompetence, unskillfulness, or a failure to take
precautions to enable the actor adequately to cope with
a possible or probable future emergency, in that
reckless misconduct requires a conscious choice of a
course of action, either with knowledge of the serious
danger to others involved in it or with knowledge of facts
which would disclose this danger to any reasonable
man.... The difference between reckless misconduct
and conduct involving only such a quantum of risk as is
necessary to make it negligent is a difference in the
degree of risk, but this difference of degree is so marked
as to amount substantially to a difference in kind.

*Id.*, cmt. g; *see also* AMJUR Negligence § 274 ("Recklessness is
more than ordinary negligence and more than want of ordinary
care; it is an extreme departure from ordinary care, a wanton or
heedless indifference to consequences, and indifference
whether or not wrong is done, and an indifference to the rights of
others"). Our criminal laws similarly distinguish recklessness and
negligence on the basis of the consciousness of the action or
inaction. *See* 18 Pa.C.S.A. § 302(b)(3), (4) (providing that a
person acts recklessly when he "consciously disregards a

21

> substantial and unjustifiable risk," while a person acts negligently when he "should be aware of a substantial and unjustifiable risk").
>
> This conceptualization of recklessness as requiring *conscious* action or inaction not only distinguishes recklessness from ordinary negligence, but aligns it more closely with intentional conduct.

*Tayar*, 47 A.3d at 1200–1201.

*Kibler*, 184 A.3d at 984-86. Following this explication, the court relied on the determination that the tracks were not inherently unexpected, a finding related to the earlier determination that they were an inherent risk of the sport. *Id.* at 986. The Court thus found that the circumstances of the case did not support a finding of gross negligence or recklessness.

The circumstances of *Kibler* differ from those presented here because, as discussed in the previous section of this Memorandum Opinion, the Court cannot decide on the current record that Plaintiff's injury resulted from a risk inherent to the sport of downhill skiing as a matter of law. Therefore, this is not a case where the Court can determine at this stage of the proceedings that the issues of gross negligence and/or recklessness can be decided as matter of law, i.e., the Court cannot conclude that "the case is entirely free from doubt, and no reasonable jury could find gross negligence." *Downey*, 817 A.2d at 525–26.

## C.   **Validity of Release**

Defendant argues that Plaintiff's negligence claims are barred by the exculpatory release provision contained on the Big Boulder lift ticket. (Doc. 31 at 30.) Plaintiff responds that he "could not have released Big Boulder from its grossly negligent or reckless conduct

because it is against public policy to release reckless behavior in a pre-injury exculpatory clause." (Doc. 36 at 22 (citing *Tayar*, 47 A.3d at 1192).) The Court concludes that because the question of gross negligence/recklessness cannot be determined at this stage of the proceedings, the validity of the lift ticket release provision cannot be determined on the current record.

Defendant does not dispute that a release does not protect a defendant from liability for acts of gross negligence and/or reckless conduct "'as such releases would jeopardize the health, safety, and welfare of the people by removing any incentive for parties to adhere to minimal standards of safe conduct.'" *Kibler*, 182 A.3d at 984 (quoting *Tayar*, 47 A.3d at 1203). (*See* Doc. 40 at 19-21.) Because the question of gross negligence and/or reckless conduct remain at issue, the validity of the lift-ticket release provision cannot be decided on summary judgment.

## V. CONCLUSION

For the reasons discussed above, the Court concludes that the Motion for Summary Judgment on Behalf of Defendant JFBB Ski Areas, Inc., (Doc. 30) is properly denied. An appropriate Order is filed simultaneously with this Memorandum Opinion.

Robert D. Mariani
United States District Judge